1

2

3

4                  UNITED STATES DISTRICT COURT

5                NORTHERN DISTRICT OF CALIFORNIA

6

7    CUONG HUY DAO,                         Case No. 23-cv-05756 EJD (PR)

             Plaintiff,

8
                                            **ORDER STRIKING PLAINTIFF'S**
9         v.                                **SUR-REPLY; GRANTING**
                                            **DEFENDANTS' MOTION FOR**
10                                          **SUMMARY JUDGMENT; DENYING**
     C. VAN HORN, et al.,                   **LEAVE TO AMEND**
11
             Defendants.                    (Docket No. 15)
12

13        Plaintiff, a state prisoner proceeding *pro se*, filed this civil rights action pursuant to

14   42 U.S.C. § 1983 against medical staff at Pelican Bay State Prison ("PBSP"), where he

15   was previously housed.  Dkt. No. 1.[1]  The Court found the complaint stated cognizable

16   claims against Defendants C. Van Horn, A. Gibbs, E. Ajimine, and E. Hassman for

17   violating Plaintiff's constitutional right to adequate medical care under the Eighth

18   Amendment.  Dkt. No. 7 at 2.  The Court ordered service of the complaint on Defendants

19   who were directed to file a motion for summary judgment or other dispositive motion.  Id.

20   at 3.

21        Defendants filed a motion for summary judgment on the grounds that Plaintiff

22   received constitutionally adequate medical care and they are entitled to qualified

23   immunity.  Dkt. No. 15.[2]  Plaintiff filed opposition, Dkt. No. 19, which is supported by his

24

25   _____

[1] All page references herein are to the Docket pages shown in the header to each document
26   and brief cited, unless otherwise indicated.
[2] In support of their motion, Defendants submit the following: (1) declaration of Defendant
27   Ajimine with exhibits, Dkt. Nos. 15-2, 15-3; (2) declaration of Dr. D. Buda, D.O., with exhibits,
     Dkt. Nos. 15-4, 15-5; declaration of Defendant Gibbs with exhibits, Dkt. Nos. 15-6, 15-7;
28   declaration of Defendant Hassman with exhibits, Dkt. Nos. 15-8, 15-9; declaration of Trang with
     exhibits, Dkt. Nos. 15-10, 15-11; and declaration of Defendant Van Horn with exhibits, Dkt. Nos.
     15-12, 15-13.

United States District Court
Northern District of California

1    declaration and exhibits, Dkt. Nos. 19-1, 19-2.[3]  Defendants replied.  Dkt. No. 20.

2        Plaintiff subsequently filed "objections" which the Court will construe as an attempt

3    to file a sur-reply.  Dkt. No. 21.  Northern District Local Rule 7-3(d)(1) provides: "If new

4    evidence has been submitted in the reply, the opposing party may file and serve an

5    Objection to Reply Evidence… stating its objections to the new evidence, which may not

6    include further argument on the motion."  Civ. L.R. 7-3(d)(1).  Here, Defendants did not

7    submit any new evidence with their reply, Dkt. No. 20, and Plaintiff did not obtain court

8    approval prior to filing the additional papers as required under Local Rule 7-

9    3(d).  Accordingly, the Court will not consider Plaintiff's "objections" in deciding

10   Defendants' summary judgment motion.  Plaintiff's sur-reply shall be STRICKEN.

11       For the reasons set forth below, Defendants' motion for summary judgment on the

12   grounds that they were not deliberately indifferent to Plaintiff's serious medical needs is

13   **GRANTED**.

14   **DISCUSSION**

15   **I.**     <u>**Statement of Facts**</u>[4]

16       At the time of the alleged incidents, Plaintiff was housed at PBSP in the

17   Administrative Segregation Unit ("ASU").  Dkt. No. 1 at 4.

18       Defendants C. Van Horn and A. Gibbs were psychiatric technicians at PBSP.  Van

19   Horn Decl. ¶ 4, Dkt. No. 15-12; Gibbs Decl. ¶ 4, Dkt. No. 15-6.  As psychiatric

20   technicians, Defendants Van Horn and Gibbs are licensed and have medical training,

21   including the removal of sutures.  Van Horn Decl. ¶ 1; Gibbs Decl. ¶ 1.  Defendant E.

22   Ajimine was a registered nurse in the ASU.  Ajimine Decl. ¶ 4, Dkt. No. 15-2.  Defendant

23   E. Hassman was a registered nurse stationed in the specialty clinic.  Hassman Decl. ¶ 4,

24   Dkt. No. 15-8.

---

[3] Plaintiff's exhibits are mostly duplicative of Defendants' exhibits in support of their summary judgment motion.  <u>Compare</u>, <u>e.g.</u>, Dkt. No. 19 at 45-46, 51, 53 with Dkt. No. 15-5 at 2-3, 5, 7.

[4] The following facts are not disputed unless otherwise indicated.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Defendants also submit the declaration of a non-party, Dr. D. Buda, who was Plaintiff's primary care physician ("PCP") during the period between July 2019 and October 2019.  Buda Decl. ¶ 4, Dkt. No. 15-4.  Dr. Buda attests that he reviewed Plaintiff's medical records, which includes treatment provided by Dr. Buda, relating to Plaintiff's injury and subsequent treatment to his right eye.  Id. ¶ 1.

On April 23, 2019, Plaintiff was involved with an altercation with another inmate[5] during which he sustained blunt trauma to his head involving a laceration above his right eye.  Van Horn Decl. ¶ 5; Buda Decl. ¶ 5, Ex, A.  Plaintiff was treated for a facial laceration forty-five minutes after this incident.  Id.  The temporal corner of his right eye had a complex wedge-shaped laceration that had been cleaned but required sutures.  Id.  Plaintiff received six interrupted sutures, approximating the skin edges and placing the corners into the anatomical orientation.  Id.  Dr. Adams scheduled an order for the removal of the six sutures for April 29, 2019.  Van Horn Decl. ¶ 5, Ex. A.  An office technician or registered nurse scheduled the follow-up appointment.  Id.  According to Plaintiff, his vision "was not injured in the fight and [he] could see good and normal."  Dao Decl. ¶ 2, Dkt. No. 19-2.

A.    **Visit with Defendant Van Horn**

On April 28, 2019, Plaintiff submitted a Form 7362 – Health Care Services Request Form, to Defendant Van Horn, requesting to have his sutures removed because it had been five days since they were placed.  Dao Decl. ¶ 5; Van Horn Decl. ¶ 6, Ex. B.  Defendant Van Horn submitted the form to the nursing station for scheduling.  Id.  Plaintiff was scheduled to see Defendant Van Horn the following day.  Id. ¶ 7.  According to Plaintiff, Defendant Van Horn came to his cell "to demand he be the staff to do the suture removal" and stated that "as a psychiatric technician he had the same training as the doctor and register[ed] nurse, and knew how to [do] suture removal."  Dao Decl. ¶ 5.  Plaintiff

---

[5] In support of his opposition, Plaintiff submitted a copy of the incident report for the altercation.  Dkt. No. 19-2 at 51

3

objected repeatedly and requested to be serviced by a doctor.  Id.  Defendant Van Horn refused and ignored Plaintiff's request.  Id.

On April 29, 2019, Plaintiff saw Defendant Van Horn as scheduled.  Id. ¶ 6; Van Horn Decl. ¶ 7.  According to Defendant Van Horn, he did not opt to remove Plaintiff's sutures on his own accord, nor did he represent to Plaintiff that his training and duties were equivalent to that of a doctor or registered nurse.  Van Horn Decl. ¶ 7.  Prior to the suture removal, Defendant Van Horn checked on Plaintiff and examined him to evaluate his overall health and the status of his wound.  Id.  Defendant Van Horn also made sure to wash his hands and glove up to ensure a clean examination and procedure.  Id.  There was no bandage or ointment covering the laceration and sutures.  Id.  Defendant Van Horn observed that the laceration was not swollen and that there was no appearance of infection.  Id. ¶ 8.  Plaintiff's right eye also appeared normal.  Id.  Plaintiff made no mention of any issues with the vision of his right eye.  Id.

Defendant Van Horn used a pre-packaged and sterile suture removal kit.  Id. ¶ 9.  The kit included items such as tweezers, a gauze pad, and small scissors.  Id.  According to Defendants, Defendant Van Horn removed one suture from an area that had healed sufficiently.  Id.  He did not attempt to remove the remaining five sutures because he observed that the laceration had not sufficiently healed in the remaining areas.  Id.  He did not "bust" the remaining sutures.  Id.  Defendant Van Horn saw that the edges of the laceration moved apart when Plaintiff would blink, which was an indication that the remaining sutures should not be removed at that point.  Id.  There was no bleeding from the area which Defendant Van Horn removed the single suture.  Id.  There was also no bleeding from the area of the laceration where the remaining five sutures were placed.  Id.

According to Defendants, Defendant Van Horn then informed Plaintiff that he would not remove the five remaining sutures because the wound had not sufficiently healed.  Id. ¶ 10.  Defendant Van Horn states that Plaintiff told him not to remove the sutures if that was the case, and Defendant Van Horn confirmed that he would not be doing so.  Id.  Defendant Van Horn requested a new appointment for Plaintiff to remove

United States District Court
Northern District of California

the remaining five sutures.  Id., Ex. C.  Defendant Van Horn did not place the order and schedule the appointment himself because he did not have access to the program to do so, nor was it part of his duties to schedule appointments.  Id.  After the appointment concluded, Defendant Van Horn memorialized removing the single suture and his observations of the status of Plaintiff's wound.  Id., Ex. D.

According to Plaintiff, Defendant Van Horn took fifteen minutes "to aggressively and painfully remove (1) suture and stop because he was unskill[ed] and bungle[d] the suture removal."  Dao Decl. ¶ 6.  Plaintiff claims Defendant Van Horn "victimized me and use[d] me as practice meat to cause unnecessary pain and injury, bleeding when he aggressively dug into flesh with tweezer and scissors fishing for threads, and re-busted wound."  Id.  Plaintiff claims Defendant Van Horn acted with deliberate indifference to his serious medical needs because "he knew he was unqualified and inexperience[d] to do suture removal but elected himself to do it anyway."  Id.

### B.    Visit with Defendant Gibbs

On May 2, 2019, Plaintiff submitted another Form 7362, requesting the removal of the five remaining sutures.  Buda Decl. ¶ 7, Ex. F.  According to Plaintiff, he requested a doctor remove the remaining sutures as Defendant Van Horn "did a botched job, remove (1) suture and re-open puncture wound."  Dao Decl. ¶ 7.  Plaintiff's appointment was scheduled and ordered by his primary caregiver at the time, Physician's Assistant ("PA") Thomas.  Van Horn Decl., Ex. C (Dkt. No. 15-13).  The appointment was scheduled for May 3, 2019, with Defendant Gibbs, who states she did not opt to remove Plaintiff's sutures of her own accord.  Gibbs Decl. ¶ 6.

According to Defendants, prior to the suture removal, Defendant Gibbs checked in with Plaintiff and examined him to evaluate his overall health and the status of his wound. Id.  Defendant Gibbs made sure to wash her hands and glove up to ensure a sterile examination and procedure.  Id.  Upon inspection of the wound, Defendant Gibbs saw that Plaintiff had a gel or Vaseline-like substance over the laceration and sutures.  Id. Defendant Gibbs told Plaintiff that he was not supposed to put anything on the wound that

1    was not ordered by his doctor.  Id.  Plaintiff responded by stating that he put the substance

2    there to prevent scarring.  Id.  Plaintiff did not have an order for the provision and use of

3    whatever he applied to the wound.  Id.  According to Plaintiff, he had applied "Neosporin

4    vaseline" to the wound.  Dao Decl. ¶ 8.

5          In order to safely access the sutures, Defendant Gibbs utilized clean gauze and

6    normal saline – also known as liquid or artificial tears – to wipe off the substances.  Gibbs

7    Decl. ¶ 7.  Defendant Gibbs obtained approval for the use of and was provided the artificial

8    tears from the RN on duty.  Id.  The artificial tears were hypoallergenic and although their

9    use within an individual's eye may result in very temporary blurriness of vision, they do

10   not cause blindness.  Id.  Before the use of any medication or substance, PTs would also

11   review the inmate's medical history to ensure they did not have a prior history of allergic

12   reactions.  Id.  If there were any indications of such history, Defendant Gibbs would not

13   have provided the artificial tears or any other medication to Plaintiff.  Id.  Defendant Gibbs

14   observed that the laceration was not swollen, that there was no appearance of infection,

15   and the wound had healed.  Id.  In order to clean away the gel-like substance, Defendant

16   Gibbs put a small amount of artificial tears on the sterile gauze and dabbed at the substance

17   in order to remove it without causing further injury or pain.  Id.  Defendant Gibbs only

18   placed enough artificial tears into the gauze to make it damp, not soaking wet, and only

19   applied it externally over the wound.  Id.  Defendant Gibbs did not drop the artificial tears

20   into Plaintiff's eyes; however, even if they were used directly in Plaintiff's eyes, they

21   would not cause blindness as they are primarily and safely used to lubricate an individual's

22   dry eyes.  Id.

23         Defendant Gibbs used pre-packaged and sterile suture-removal kit.  Gibbs Decl. ¶ 8.

24   The kit included items such as tweezers, a gauze pad, and small scissors.  Id.  According to

25   Defendants, Defendant Gibbs safely removed the five remaining sutures without incident

26   and the stitch removal took less than an hour.  Id.  Defendant Gibbs also states that the

27   suture removal would have been much easier had Plaintiff not placed the gel-like

28   substance on his sutures.  Id.  At no point did Plaintiff tell Defendant Gibbs to stop with

United States District Court
Northern District of California

6

the suture removal or the use of artificial tears.  <u>Id.</u>  Once the procedure was completed, Defendant Gibbs sent Plaintiff back to his housing unit.  <u>Id.</u>  Defendant Gibbs recorded "stitches removed with no issues" in Plaintiff's medical records.  <u>Id.</u>, Ex. A.

According to Plaintiff, Defendant Gibbs was not "unqualified and inexperience[d] to perform the suture removal."  Dao Decl. ¶ 8.  He states it took Defendant Gibbs about an hour "to painfully dig into my flesh with the tweezer and scissor fishing for the threads."  <u>Id.</u>  Plaintiff claims Defendant Gibbs "used me as practice meat, caused unnecessary pain, unlawful injury to my right eye."  <u>Id.</u>  He also states that "there was no greater pain when the chemical liquid was put into my right eye than what I was already feeling."  <u>Id.</u>  He claims Defendant Gibbs "blatantly lied to claim she did not put any chemical liquid into my right eye."  <u>Id.</u>  Plaintiff asserts Defendant Gibbs "acted with criminal intent and deliberate indifference when she had sadistically harmed my right eye vision."  <u>Id.</u>  He claims that after he returned to his cell, his right eye hurt to touch, and his vision was severely blurry.  <u>Id.</u>  He claims before his visit with Defendant Gibbs, he could see "90% good and normal."  <u>Id.</u>

### C.   <u>Visits with Defendant Ajimine</u>

During May 2019, Plaintiff submitted three Form 7362s, requesting an appointment with an eye doctor because he was having impeded vision in his right eye.  Buda Decl. ¶ 8, Exs. F, G, I; Ajimine Decl. ¶ 5b.  At the time, Defendant Ajimine was the RN for the ASU, where Plaintiff was housed.  Ajimine Decl. ¶ 4.  No other RN served with Defendant Ajimine in the ASU unless it was a weekend or holiday.  <u>Id.</u>  Defendant Ajimine's duties included reviewing Form 7362 requests, scheduling medical appointments, and conducting examinations during those appointments.  <u>Id.</u> ¶ 5a.  Based on the type of request, appointments can be scheduled urgently for a same-day appointment but are more regularly scheduled for the next day.  <u>Id.</u>  During these appointments, inmates are physically examined by an RN; if the inmate's medical issues cannot be dealt with by the RN or if there is cause for an emergency, they will then be seen by a doctor.  <u>Id.</u>  Every inmate is required to be physically examined by an RN before any referral to a doctor is

United States District Court
Northern District of California

1   made.  Id.

2       Plaintiff's first grievance filed on May 9, 2019, was reviewed the next day, Friday,

3   May 10, 2019.  Ajimine Decl. ¶ 5b, Ex. B.  He was scheduled for an appointment on

4   Monday, May 13, 2019.  Id.  When he came into the clinic for an examination, Plaintiff

5   refused the visit and said he did not want to see Defendant Ajimine.  Id.

6       Five days later on Saturday, May 18, 2019, Plaintiff submitted another Form 7362

7   requesting to see an eye doctor, but on Monday, May 20, 2019, he again refused to be

8   examined by Defendant Ajimine.  Id., Ex. C.  He also refused to sign the Form 7225

9   refusal, stating that he would not sign anything.  Id., Ex. D.  After this second encounter,

10  Defendant Ajimine spoke with Supervisory Registered Nurse ("SRN") K. Smith about

11  Plaintiff's refusals.  Ajimine Decl. ¶ 5b.  SRN Smith told Defendant Ajimine to inform

12  Plaintiff that he was the only RN stationed in the ASU and that Plaintiff needed to come

13  out and see Defendant Ajimine to be processed for the Form 7362 request.  Id., Ex. C at 1.

14      The next day on May 21, 2019, Plaintiff submitted another Form 7362 for issues

15  with his right eye vision and stated that he did not want to be seen by Defendant Ajimine

16  because he had submitted an active healthcare grievance against Defendant Ajimine.  Id.,

17  Ex. E.  The following day, May 22, 2019, Plaintiff again refused to be examined by

18  Defendant Ajimine.  Id., Ex. F.  According to Plaintiff, Defendant Ajimine informed him,

19  "either you let me process you, or you don't get to see a doctor at all."  Dao Decl. ¶ 10.

20      The healthcare grievance to which Plaintiff referred was filed in January 2019, and

21  involved an allegation of sexual harassment based on Defendant Ajimine calling him

22  "Miss Dao."  Ajimine Decl. ¶ 7; Dao Decl. ¶ 9; Dkt. No. 19-2 at 37.  Defendant Ajimine

23  denies the allegation.  Ajimine Decl. ¶ 7.  The grievance was investigated by the California

24  Correctional Health Care Services ("CCHCS") which issued a decision on June 28, 2019,

25  concluding that staff, including Defendant Ajimine, committed no wrongdoing and did not

26  violate CDCR policy.  Id., Ex. I.  No disciplinary action was taken against Defendant

27  Ajimine.  Id.

28

United States District Court
Northern District of California

8

In response to the third refusal to be seen by him, Defendant Ajimine requested an order for an autorefraction test for Plaintiff considering his complaints of decreased vision. Ajimine Decl. ¶ 6. Defendant Ajimine also informed Plaintiff's primary caregiver, PA Thomas, that Plaintiff had requested medical examination three times but had refused to see Defendant Ajimine those three times. Id., Ex. G. PA Thomas cosigned and submitted the order for an autorefraction test. Id., Ex. H.

According to Plaintiff, Defendant Ajimine "unlawfully acted to delay, denied and interfere with my access to a doctor and care." Dao Decl. ¶ 8. He claims Defendant Ajimine refused to process his requests "and wantonly retaliated against me." Id. ¶ 9. Plaintiff also claims Defendant Ajimine's order for an autorefraction test amounted to "no care at all" because his "right eye was blinded" and he "did not need to be fitted for glasses." Id. ¶ 10. He claims Defendant Ajimine acted "to further harm my eye sight and denied access to a doctor," and that his "wanton indifferent action prolong[ed] suffering of unnecessary pain and injury resulted in permanent blindness to my right eye vision." Id.

### D.    Visit with Defendant Hassman

In May 2019, Defendant Hassman's primary assignment was within the specialty clinic. Hassman Decl. ¶ 4. Defendant Hassman's duties included assisting the optometrist, Dr. Ryan, when he worked within the clinic once or twice a week, conducting optometry tests – including autorefraction – to determine if inmates needed prescription glasses; she would also assist providers with minor surgical procedures. Id. Defendant Hassman does not have training in using an x-ray machine, and she did not have access to an x-ray machine at PBSP. Id. In Dr. Ryan's absence, Defendant Hassman would conduct tests, including autorefraction, as ordered by inmates' providers. Id. ¶ 5. In conducting optometric tests like autorefraction, she would routinely need to sue dilating eyedrops to dilate an inmate's pupils to more accurately inspect the inner eye. Id. Where it was necessary to dilate an inmate's pupils, Dr. Ryan would usually be present for further examination of the test results. Id.

1    According to Defendants, an autorefraction test is a routine optometric test. <u>Id.</u>

2  The test uses an autorefractor – not an x-ray – to measure how well an individual's eye

3  processes light to determine their refractive error. <u>Id.</u> The inmate will place their chin on

4  the device and the machine will then project an image into the eye, passing through the

5  part of the inner eye, off the retina and back to the machine's sensor. <u>Id.</u> It does not fire x-

6  rays into the inmate's eyes, and it does not cause blindness. <u>Id.</u>; Buda Decl. ¶ 8. It helps

7  optometrists to image the inner eye and determine the prescription needed if eyeglasses are

8  prescribed. Hassman Decl. ¶ 5. This may be done multiple times to obtain a viable

9  sample of results that ensures the test is done correctly. <u>Id.</u>

10    As part of the autorefraction test, Defendant Hassman uses dilating eye drops to

11  dilate the inmate's pupil to more easily examine the inner eye. <u>Id.</u> The eye drops do not

12  blind individuals but may make their vision more sensitive to light—this effect is

13  temporary and does not cause blindness. <u>Id.</u>; Buda Decl. ¶ 8. An inmate could at any

14  point tell Defendant Hassman to stop conducting the test or may refuse the test altogether.

15  Hassman Decl. ¶ 5. It is also impossible to detach an individual's retina by dilation or the

16  autorefraction test—trauma or blunt force is needed to detach the retina. <u>Id.</u>

17    On May 22, 2019, the same day he refused for the third time to see Defendant

18  Ajimine, Plaintiff saw Defendant Hassman for an autorefraction test in the specialty clinic.

19  Hassman Decl. ¶ 6, Ex. A. The order did not call for a full nursing assessment; therefore,

20  Defendant Hassman's duties dictated that the only service she would provide was to

21  conduct the test. <u>Id.</u> The provider would then examine the results. <u>Id.</u> Before conducting

22  the test, Defendant Hassman dilated Plaintiff's pupils using the standard eye drops. <u>Id.</u> ¶ 7.

23  After waiting for the drops to take their effect and dilate his pupils, Defendant Hassman

24  had Plaintiff rest his chin on the autorefractor and conducted the test on his right eye. <u>Id.</u>

25  Defendant Hassman made multiple attempts to capture a viable sample of results. <u>Id.</u> She

26  did not attempt to damage Plaintiff's eyesight in his right eye. <u>Id.</u> Defendant Hassman

27  finished the test on Plaintiff's right eye and conducted the test on his left eye to obtain

28  comparable results. <u>Id.</u> Once the tests were completed, she sent Plaintiff back to his

United States District Court
Northern District of California

1  housing unit.  Id.  Defendant Hassman then provided the results of the test to Plaintiff's

2  provider and noted in his records that the test on his right eye could not capture results,

3  despite multiple attempts.  Id., Ex. B.  At no point during the test did Plaintiff indicate to

4  Defendant Hassman that he wanted to stop the test.  Id.

5       According to Plaintiff, after Defendant Hassman took a few "shots" on the

6  autorefraction device, he felt "the invisible radiated heat flashes burning my right eyeball

7  with the invisible ray each time Rn. Hassman click the machine to take the shot."  Dao

8  Decl. ¶ 11.  Plaintiff "instinctively move[d his] head away a couple of time from the

9  assaultive device."  Id.  Plaintiff claims Dr. Ryan was present and quietly observing

10  throughout the test.  Id.  He claims Defendant Hassman "blatantly lied when she claimed

11  she did not damage[] my eyes, especially my right eye with the auto-refraction machine or

12  some other machine she weaponized to attack[] me with that day."  Id.  According to

13  Plaintiff, Defendant Hassman instead used an x-ray camera machine and burned his right

14  eye while taking photos of the back of his right eye.  Dkt. No 1 at 12.  He asserts

15  Defendant Hassman permanently damaged the vision in his right eye by firing x-rays into

16  it.  Id. at 12-13.  Plaintiff claims Defendant Hassman "deliberate indifference action to

17  assault[] me with the camera machine caused unnecessary pain, injury and damages which

18  resulted in permanent lost of my right eye vision."  Id.  He claims after this visit, the vision

19  in his right eye "became 98% blindness."  Id.

20       **E.    Subsequent Treatment of Plaintiff's Right Eye**

21       As a result of the inconclusive autorefraction test, Plaintiff was referred for a

22  consult with optometry.  Buda Decl. ¶ 8, Ex. L.  Three weeks after the autorefraction test,

23  on June 12, 2019, Plaintiff's right eye was examined by an optometrist, Dr. Ryan.  Id. ¶ 9.

24  Dr. Ryan identified Plaintiff's right eye as having a dense cataract with decreasing visual

25  acuity.  Id.  Following this examination, Plaintiff was referred to be evaluated by an

26  ophthalmologist for cataract surgery within the next 30-45 days.  Id., Ex. M.

27       On July 19, 2019, Plaintiff was examined by an ophthalmologist, Dr. Gibb (non-

28  party), for potential cataract surgery.  Buda Decl. ¶ 10.  However, Dr. Gibb's examination

United States District Court
Northern District of California

11

showed that Plaintiff suffered a retinal detachment in his right eye that was possibly caused by trauma.  Id., Ex. N.  Dr. Gibb recommended surgery and referral to a retinal specialist, noting: "Recommend repair within a few weeks. If not addressed Vision loss will progress to NLP."  Id.  Based on Dr. Gibb's recommendation, a "high priority (within 14 days)" order was placed for Plaintiff to be seen by a retinal specialist for evaluation.  Id., Ex. O.

On July 31, 2019, Plaintiff's right eye was evaluated by the retinal specialist, Dr. Rodden (non-party).  Buda Decl. ¶ 11, Ex. P.  Plaintiff relayed to Dr. Rodden that he suddenly lost vision in his right eye on or about May 3, 2019, and that he had been punched in the face in an altercation two weeks prior.  Id.  Plaintiff eventually disclosed that his vision became blurry within minutes of the fight.  Id.  Dr. Rodden's examination revealed a total retinal detachment in Plaintiff's right eye.  Id.  Dr. Rodden discussed surgical repair of the retina and informed Plaintiff of the benefits and risks of such an operation.  Id. ¶ 11.  Dr. Rodden also recommended an "Avasin/Dexamethasone combination injection" in the right eye for "Macular Edema,"[6] which was given and "tolerated well" by Plaintiff.  Id.  Dr. Rodden's notes stated that Plaintiff understood the post-injection instructions as well as his "condition, prognosis and need for follow up care."  Id.  He noted that surgery would be scheduled within the next two weeks.  Id.

According to Plaintiff, he denies telling Dr. Rodden that his vision became blurry within minutes of the fight at the appointment on July 31, 2019.  Dao Decl. ¶ 17.  Plaintiff asserts that he saw Dr. Rodden for a follow-up appointment on August 2, 2019.  Id.  Plaintiff claims that at this visit, Dr. Rodden informed him that he would need a vitrectomy surgery as well as the retinal detachment surgery.  Id.  Plaintiff also claims that it was during this visit that Dr. Rodden injected his right eye with a gel called "Avastin/Axamethasone" which "inflated and hardened" the eye.  Id.  Plaintiff states that the substance is still in his right eyeball as of the date of the opposition.  Id. ¶ 31.

---

[6] According to the American Academy of Opthamology: "Macular edema happens when fluid builds up in the macula, causing swelling. This can distort vision, making things look blurry and colors look washed out."  https://www.aao.org/eye-health/diseases/what-is-macular-edema.

United States District Court
Northern District of California

On August 5, 2019, Plaintiff refused his off-site surgical appointment, refusing to move forward with care unless he got a second opinion. Buda Decl. ¶ 12, Ex. R. RN Nasr and Supervisory RN Ray explained in detail the risks and benefits of refusing retinal surgery. Id. Plaintiff continued to refuse the offsite appointment without a second opinion and signed a Form 7225 refusal. Id., Ex. S. The next day, Plaintiff filed a health care grievance against RN Nasr, claiming she wrongly denied his request for a second opinion. Dkt. No. 19-2 at 74.

On August 16, 2019, Dr. Buda spoke with Plaintiff regarding his refusal of retinal surgery to repair the detached retina in his right eye. Buda Decl. ¶ 13, Ex. T. Plaintiff was adamant in obtaining an additional opinion before having his surgery. Id. Dr. Buda explained the risks and benefits of delaying his surgery. Id. Dr. Buda additionally explained that Dr. Gibb and Dr. Rodden were both board certified ophthalmologists who agreed that he had a complete right retinal detachment. Id. Dr. Buda further explained that delaying the surgery would likely lead to permanent blindness and that Plaintiff could obtain a third opinion, but that he would be responsible for the costs related to such a visit. Id. According to Defendants, Plaintiff confirmed that he understood and agreed that he would let Dr. Buda know if he changed his mind and opted for surgery. Id., Ex. T.

According to Plaintiff, Dr. Buda informed him that he had to pay $200 co-pay to get another opinion. Dao Dec. ¶ 19. Plaintiff responded that "it was their staff misconduct… that blinded [him] so why won't they cover it?" Id. He also informed Dr. Buda that he could not afford the copay, and although he wanted surgery to restore his sight, he still wanted a second opinion and the CDCR to pay for it. Id. According to Plaintiff, he asked Dr. Buda to reconsider and waited two months for a response. Id. Although Dr. Buda is not a party to this action, Plaintiff alleges in opposition that Dr. Buda acted with deliberate indifference which resulted in total blindness to his right eye. Id.

On December 25, 2019, Plaintiff submitted a Form 7362 request for medical services stating that his right eye vision had decreased completely. Buda Decl. ¶ 14. However, he again refused examination by an RN, this time by RN Geiger. Id., Exs. U, V.

1    Plaintiff was informed of the importance of the retinal surgery in light of the risk of

2    permanent loss of vision in his right eye.  Id.

3         According to Plaintiff, on this date, RN Geiger "was toying with me again, much

4    like RN Ajimine had done."  Dao Decl. ¶ 37.  Plaintiff states RN Geiger refused to forward

5    his 7362 to another RN or doctor for surgery.  Id.  He claims RN Geiger's "indifferent

6    action resulted in the permanent loss of my right eye vision."  Id.

7         Plaintiff's most recent visit with an ophthalmologist regarding the vision in his right

8    eye was in July 2021; at that point he had not received any corrective surgery.  Buda Decl.

9    ¶ 14.  According to Dr. Buda, Plaintiff's medical records indicate as of November 7, 2024,

10   that he never opted to receive corrective surgery for his right detached retina.  Id.

11        According to Plaintiff, he submitted a Form 7362 on January 6, 2020, requesting

12   "eye retinal surgery ASAP."  Dao Decl. ¶ 42; Dkt. No. 19-1 at 50.  He submitted another

13   Form 7362 on January 9, 2020, repeating his need for a "retinal detachment surgery

14   immediately."  Id. ¶ 44; Dkt. No. 19-1 at 52.  He submitted another on January 20, 2020.

15   Id. ¶ 45; Dkt. No. 19-1 at 54.  Then on January 24, 2020, Plaintiff was transferred from

16   PBSP to CSP-SAC, an "E.O.P. Custody prison."  Id. ¶ 46.

## II.    Summary Judgment

18        Summary judgment is proper where the pleadings, discovery and affidavits show

19   that there is "no genuine dispute as to any material fact and the movant is entitled to

20   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment

21   "against a party who fails to make a showing sufficient to establish the existence of an

22   element essential to that party's case, and on which that party will bear the burden of proof

23   at trial . . . since a complete failure of proof concerning an essential element of the

24   nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v.

25   Catrett, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of

26   the lawsuit under governing law, and a dispute about such a material fact is genuine "if the

27   evidence is such that a reasonable jury could return a verdict for the nonmoving party."

28   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

United States District Court
Northern District of California

14

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. See Celotex Corp., 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. See Liberty Lobby, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (citations omitted); Fed. R. Civ. P. 56(e). "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corporation Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Liberty Lobby, 477 U.S. at 252). "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." Id. (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." Id. (citing Liberty Lobby, 477 U.S. at 252). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Celotex Corp., 477 U.S. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631. It is not the task of the district court to scour the record

1    in search of a genuine issue of triable fact.  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir.

2    1996).  The nonmoving party has the burden of identifying with reasonable particularity

3    the evidence that precludes summary judgment.  Id.  If the nonmoving party fails to do so,

4    the district court may properly grant summary judgment in favor of the moving party.  See

5    id.; see, e.g., Carmen v. San Francisco Unified School District, 237 F.3d 1026, 1028-29

6    (9th Cir. 2001).

7        **A.    Deliberate Indifference**

8        Deliberate indifference to a prisoner's serious medical needs violates the Eighth

9    Amendment's proscription against cruel and unusual punishment.  See Estelle v. Gamble,

10   429 U.S. 97, 104 (1976).  A determination of "deliberate indifference" involves an

11   examination of two elements: the seriousness of the prisoner's medical need and the nature

12   of the defendant's response to that need.  See McGuckin v. Smith, 974 F.2d 1050, 1059

13   (9th Cir. 1992), overruled in part on other grounds by WMX Technologies, Inc. v. Miller,

14   104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

15       A "serious" medical need exists if the failure to treat a prisoner's condition could

16   result in further significant injury or the "unnecessary and wanton infliction of pain."

17   McGuckin, 974 F.2d at 1059 (citing Estelle, 429 U.S. at 104).  The existence of an injury

18   that a reasonable doctor or patient would find important and worthy of comment or

19   treatment; the presence of a medical condition that significantly affects an individual's

20   daily activities; or the existence of chronic and substantial pain are examples of indications

21   that a prisoner has a serious need for medical treatment.  Id. at 1059-60 (citing Wood v.

22   Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

23       A prison official is deliberately indifferent if he knows that a prisoner faces a

24   substantial risk of serious harm and disregards that risk by failing to take reasonable steps

25   to abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The prison official must not

26   only "be aware of facts from which the inference could be drawn that a substantial risk of

27   serious harm exists," but he "must also draw the inference."  Id.  If a prison official should

28   have been aware of the risk, but was not, then the official has not violated the Eighth

United States District Court
Northern District of California

16

1   Amendment, no matter how severe the risk.  Gibson, 290 F.3d at 1188.

2           In order for deliberate indifference to be established, therefore, there must be a

3   purposeful act or failure to act on the part of the defendant and resulting harm.  See

4   McGuckin, 974 F.2d at 1060; Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d

5   404, 407 (9th Cir. 1985).  Additionally, the defendant's actions must be the cause of the

6   injury suffered by the plaintiff.  Conn v. City of Reno, 591 F.3d 1081, 1098 (9th Cir.

7   2010), reinstated as modified by 658 F.3d 897 (9th Cir. 2011); see id. at 1098-1102

8   (reversing grant of summary judgment to transporting police officers where children of

9   pre-trial detainee who committed suicide presented evidence that transporting police

10  officers (a) were subjectively aware the decedent was at acute risk of harm (suicide); (b)

11  failed to respond properly to that risk by informing jail officials; and (c) such failure was

12  both the actual and proximate cause of the decedent's suicide once at the jail).  A finding

13  that the defendant's activities resulted in "substantial" harm to the prisoner is not

14  necessary, but the existence of serious harm tends to support an inmate's deliberate

15  indifference claims, Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing McGuckin,

16  974 at 1060).

17          Once the prerequisites are met, it is up to the factfinder to determine whether

18  deliberate indifference was exhibited by the defendant.  Such indifference may appear

19  when prison officials deny, delay, or intentionally interfere with medical treatment, or it

20  may be shown in the way in which prison officials provide medical care.  See McGuckin,

21  974 F.2d at 1062 (delay of seven months in providing medical care during which medical

22  condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain"

23  sufficient to present colorable § 1983 claim).  Compare Lolli v. County of Orange, 351

24  F.3d 410, 420-21 (9th Cir. 2003) (applying subjective deliberate indifference test and

25  holding that a jury could infer that correctional officers' failure to provide medical care in

26  response to detainee's extreme behavior, sickly appearance and statements that he was

27  diabetic and needed food demonstrated deliberate indifference); and Clement v. Gomez,

28  298 F.3d 898, 905 (9th Cir. 2002) (jury could find deliberate indifference where officials

denied showers and medical attention to inmates who had been exposed to pepper-spray where officials themselves were coughing and gagging and stepped outside for fresh air, and the inmates made repeated requests for attention); with Peralta v. Dillard, 744 F.3d 1076, 1083-84 (9th Cir. 2014) (en banc) (jury can be instructed to consider whether medical official lacked necessary resources when determining if medical official was deliberately indifferent with respect to monetary damages).

The deliberate indifference standard does not require a showing that the prison official acted with an improper motive, such as an intent to harm; it is enough that the official acted or failed to act despite knowledge of a substantial risk of serious harm. Edmo v. Corizon, 935 F.3d 757, 793 (9th Cir. 2019), reh'g en banc denied by 949 F.3d 489 (9th Cir. 2020) (prison doctor exhibited deliberate indifference when he knew of and disregarded an excessive risk to plaintiff's health by rejecting her request for GCS and then never re-evaluating his decision despite evidence that plaintiff continued to suffer clinically significant distress even though he provided other treatment to plaintiff).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004)

## B.    Claims Against Defendants Van Horn and Gibbs

Plaintiff claims Defendants Van Horn and Gibbs were unqualified to remove his sutures but they did so regardless, resulting in unnecessary pain and injury. Plaintiff claims their actions amount to deliberate indifference to his serious medical needs.

Defendants assert that Defendants Van Horn and Gibbs were qualified medical personnel who provided adequate care in removing Plaintiff's sutures and did not damage his vision. Dkt. No. 15 at 18. Defendants assert that Defendants Van Horn and Gibbs are

United States District Court
Northern District of California

psychiatric technicians with licensing and medical training, including the removal of sutures. Id. at 19.  Defendants contend that Defendant Van Horn only removed one suture in the area that had sufficiently healed and made the decision not to attempt further removal of the remaining sutures because his medical training and experience equipped him to recognize that Plaintiff's laceration had not fully healed.  Id.  Defendants contend that there was no bleeding from the area where Defendant Van Horn removed the single suture or from the remaining sutures.  Id.  Furthermore, Defendants contend Defendant Gibbs was similarly qualified to remove Plaintiff's five remaining sutures, and that the procedure proceeded without incident.  Id.  Contrary to Plaintiff's allegations, Defendants assert Defendant Gibbs used a hypoallergenic solution of normal saline (artificial tears) which he obtained from the RN on duty, and that it was necessary to use to remove the gel-like substance that Plaintiff had applied to the wound.  Id. at 19-20.  Defendants also contend that even if the saline went into Plaintiff's eye, it would not cause blindness.  Id. at 20.  They also submit the expert opinion of Dr. Buda, who attests that Defendants Van Horn and Gibb's process in removing the sutures was inconsequential and had no bearing on the loss of vision in Plaintiff's right eye because the damage that caused his blindness was interior.  Id.  Dr. Buda states that it was the detached retina caused by trauma to Plaintiff's head that caused the blindness.  Id.

In opposition, Plaintiff contends that psychiatric technicians, like Defendant Van Horn, are not technically "medical staff" as they are not licensed like a registered nurse and doctor.  Dkt. No. 19 at 28.  He asserts that Dr. Adam's order for suture removal did not indicate that Defendant Van Horn was to do the procedure.  Id. at 29.  He contends that Defendant Van Horn "aggressively and painfully" removed one suture and Defendant was "unskill[ed] and bungle[d] the suture removal surgery."  Id.  He also claims Defendant Van Horn lied in his declaration when he stated that Plaintiff told him not to remove the five remaining sutures because it had not fully healed.  Id.  Plaintiff asserts that the wound had healed nicely but that Defendant Van Horn reinjured it during the removal.  Id.

1    Similarly, Plaintiff alleges Defendant Gibbs was also unqualified as a psychiatric

2  technician to remove the sutures.  Id.  He alleges Defendant Gibbs "painfully dug into [his]

3  flesh with tweezer and scissor fishing for threads to remove (5) sutures."  Id. at 30.  He

4  asserts that her use of a "chemical liquid" into his right eye resulted in blurry vision,

5  unnecessary pain and injury, and permanent blindness.  Id.  He denies putting any ointment

6  on his eye, and that Defendants' attempt to avert blame "is an evasion of guilt and justice."

7  Id.

8    In reply, Defendants assert that Plaintiff provides no medical documentation or

9  opinion to support his claim that Defendants Van Horn and Gibbs were unqualified and

10  used him as "practice meat."  Dkt. No. 20 at 2-3.  Defendants assert that Plaintiff did not

11  have a right to choose a specific type of treatment, and that he offers no medical opinion

12  sufficiently rebutting Dr. Buda's opinion that Defendants were sufficiently qualified and

13  the process of removing the sutures was inconsequential and had no bearing on the loss of

14  vision in his right eye which was caused by interior damage.  Id. at 3.

15    Having carefully reviewed the evidence and construing the evidence in the light

16  most favorable to Plaintiff when appropriate, the Court finds that there is no genuine

17  dispute as to any material fact relating to Plaintiff's claim that Defendants Van Horn and

18  Gibbs acted with deliberate indifference to his serious medical needs.  Defendant Van

19  Horn's only involvement in this matter was Plaintiff's first appointment for suture removal

20  on April 29, 2019.  See supra at 3-4.  It is undisputed that Plaintiff requested this

21  procedure.  Id.  The fact that someone other than a doctor was assigned to provide this

22  treatment does not establish deliberate indifference, especially when the medical staff was

23  trained in this area.  Other than his own lay opinion that Defendant Van Horn was not

24  qualified, Plaintiff has set forth no probative evidence by which a reasonable jury would

25  find otherwise.  Lastly, a difference of opinion over this course of treatment does not give

26  rise to a § 1983 claim.  Franklin, 662 F.2d at 1344.

27    It is also undisputed that Plaintiff's sole medical need at this appointment was the

28  removal of the sutures as he had not yet made any complaint of vision loss.  The removal

20

of sutures does not amount to a "serious" medical need because there is no indication, nor is there any allegation, that the failure to treat could result in further significant injury or the "unnecessary and wanton infliction of pain." McGuckin, 974 F.2d at 1059. But even if he did have a serious medical need, Plaintiff does not allege that Defendant Van Horn was aware that Plaintiff faced a substantial risk of serious harm, *i.e.*, loss of vision, if he failed to properly remove all the sutures. See supra at 5. Rather, it is undisputed that Defendant Van Horn stopped after removing one suture. Id. Plaintiff alleges that Defendant Van Horn "bungled" the procedure, but even if that were true, Defendant's decision to stop was reasonable in order to avoid inflicting further harm rather than ignoring a substantial risk of it, especially if it were true that Plaintiff was experiencing unnecessary pain and bleeding. Id. Lastly, Plaintiff has set forth no probative evidence to support his allegation that Defendant Van Horn's actions resulted in the loss of vision in his right eye. McGuckin, 974 F.2d at 1060; Conn, 591 F.3d at 1098.

Moreover, even if it were true that Defendant Van Horn was not qualified to perform the suture removal or even that he performed the procedure incorrectly, his conduct might at most amount to malpractice or negligence, perhaps even gross negligence, which is insufficient to make out a violation of the Eighth Amendment. See Toguchi, 391 F.3d at 1060; Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002); Franklin, 662 F.2d at 1344. Consequently, there is no triable factual issue from which a reasonable fact-finder could conclude that Defendant Van Horn knowingly disregarded a substantial risk of serious harm, i.e., vision loss to Plaintiff's right eye, in the care he provided. Farmer, 511 U.S. at 837.

Similar to Defendant Van Horn, Plaintiff's allegations regarding Defendant Gibbs' lack of qualifications and ability in removing the remaining sutures on May 3, 2019, even if true, amount to nothing more than perhaps malpractice or negligence, which are not actionable under § 1983. Again, Plaintiff was the one who requested this procedure, and he was not constitutionally entitled to have a doctor perform it rather than a psychiatric technician. Also at this appointment, Plaintiff had no "serious" medical need because

there was no indication that a failure to properly remove the sutures could result in further significant injury. Furthermore, Plaintiff sets forth no evidence to support his allegation that Defendant Gibbs applied "chemical liquid" into his right eye rather than harmless artificial tears, and that this liquid was the cause of Plaintiff's loss of vision nor does the medical record support such a conclusion. Rather, the diagnosis of the two ophthalmologists who examined Plaintiff was that the cause for the vision loss was retinal detachment due to trauma; there is no indication from their examination that the cause involved the application of a chemical liquid. In response, Plaintiff has failed to come forth with evidence in support his claim against Defendant Gibbs from which a jury could reasonably render a verdict in his favor. In re Oracle Corporation Securities Litigation, 627 F.3d at 387.

Based on the foregoing, Defendants have shown there is no genuine issue of material fact as to whether Defendants Van Horn and Gibbs violated Plaintiff's Eighth Amendment rights during the suture removal procedures. See Celotex Corp., 477 U.S. at 323. In response, Plaintiff has failed to designate specific facts showing that there is a genuine issue for trial or identify with reasonable particularity the evidence that precludes summary judgment. Id. at 324; Keenan, 91 F.3d at 1279. Accordingly, Defendants are entitled to summary judgment on the Eighth Amendment claim against Defendants Van Horn and Gibbs.

### C.   Claim Against Defendant Ajimine

Defendants assert that Defendant Ajimine was not deliberately indifferent to Plaintiff's medical needs because Defendant actually attempted to provide medical services to Plaintiff in accordance with CDCR medical policy. Dkt. No. 15 at 20. Defendants assert that it was Plaintiff who actively delayed his own treatment by refusing medical treatment on at least three occasions. Id. In response to Plaintiff's requests for medical services during May 2019, Defendant Ajimine processed and scheduled his appointments. Id. Defendants assert that Plaintiff was not entitled to choose the treating RN nor was he entitled to bypass the RN and visit a doctor absent an emergency. Id.

United States District Court
Northern District of California

1      Defendants also contend that this policy was explained to Plaintiff as well as the fact that

2      Defendant Ajimine was the only RN stationed in the ASU.  Id.  Defendants assert that

3      Plaintiff's claim that he did not want to see Defendant Ajimine due to an outstanding

4      healthcare grievance was meritless because the CCHCS level response found no

5      wrongdoing by Defendant.  Id.  Defendants assert that Defendant Ajimine made the

6      appropriate referral for autorefraction in response to Plaintiff's medical condition, i.e.,

7      decreasing vision in his right eye, and that it was Plaintiff's own continual refusal of

8      surgery that resulted in his loss of vision.  Id.

9            In opposition, Plaintiff asserts that he experienced 36 days of delay due to

10     Defendant Ajimine's denial of access to a doctor and adequate care.  Dkt. No. 19 at 33.  He

11     asserts that when he first saw Defendant Ajimine on May 10, 2019, Defendant was aware

12     of his impeded and blurry vision but deliberately failed to respond with an urgent order to

13     punish, retaliate, and prolong his suffering due to his pending grievance against him.  Id. at

14     34.  Plaintiff also asserts that he had a lawful reason not to be in close contact with

15     Defendant for fear of more sexual harassment and other misconduct.  Id.  Plaintiff asserts

16     that he ultimately allowed Defendant Ajimine to process him after his third request from

17     fear of permanent blindness.  Id. at 36.  He claims that Defendant's order for an

18     autorefraction test amounted to no care because his right eye blindness could not be treated

19     by prescription glasses.  Id. at 36-37.  Plaintiff claims that Defendant Ajimine worked with

20     Defendant Hassman "maliciously… to further destroy [his] right eyesight."  Id. at 37.   He

21     asserts Defendant Ajimine unlawfully denied, delayed, and interfered with his access to a

22     doctor and adequate treatment which prolonged unnecessary pain and injury resulting in

23     permanent blindness.  Id. at 38.

24            In reply, Defendants assert Plaintiff offers no evidence for the record that

25     corroborates his claim beyond his own unqualified opinions and conjectures as to the

26     interaction between Defendants Ajimine and Hassman.  Dkt. No. 20 at 3.  Defendants

27     contend that Plaintiff delayed his own medical treatment by refusing to be appropriately

28     examined by Defendant Ajimine despite multiple attempts to provide medical services.  Id.

United States District Court
Northern District of California

Defendants assert that Plaintiff was not entitled to choose the treating RN, nor to bypass the RN and visit a doctor unless there is an emergency.  Id.  Lastly, Defendants assert that Plaintiff's attempt to justify his own delay based on a pending grievance against Defendant Ajimine is unfounded and rebutted by the CCHCS level response that found no wrongdoing by Defendant.  Id.

Having carefully reviewed the evidence and construing the evidence in the light most favorable to Plaintiff when appropriate, the Court finds that there is no genuine dispute as to any material fact relating to Plaintiff's deliberate indifference claim against Defendant Ajimine.  It is undisputed that in his healthcare requests, Plaintiff complained of impeded vision in his right eye ("95 percent" vision loss), and blurry vision which he blamed on the suture removals.  See supra at 7.  However, there is no evidence that Defendant Ajimine knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable steps to abate it.  Rather, it is undisputed that Defendant Ajimine promptly reviewed each of Plaintiff's healthcare requests, scheduled an appointment to see him on the next business day, and then attempted to evaluate Plaintiff for a referral to a doctor.  See supra at 7.  However, Plaintiff refused to be evaluated by Defendant Ajimine and instead demanded to see a doctor or another nurse.  Id. at 8.  But as discussed above, this difference of opinion over the course of treatment does not rise to a § 1983 claim.  Id. at 21.

Furthermore, the undisputed evidence shows that there was no other available RN to see Plaintiff and that Defendant Ajimine's supervisor instructed that Plaintiff must be evaluated by Defendant Ajimine before being considered for a referral; accordingly, it was not Defendant Ajimine's decision to be the one to evaluate Plaintiff.  Id. at 8. Furthermore, it was not until his third healthcare request that Plaintiff explained his reason for not wanting to be seen by Defendant Ajimine.  Accordingly, any delay in treatment until that time was caused by Plaintiff rather than Defendant Ajimine.  Then after Plaintiff's third refusal to be evaluated by him, Defendant Ajimine ordered an autorefraction test to attempt to address Plaintiff's vision loss.  Plaintiff sets forth no

24

1    evidence establishing that this was an unreasonable course of treatment given his

2    complaint of vision loss. Lastly, even if it could be said that Defendant Ajimine was

3    responsible for any delay, there is no evidence that he acted despite knowing there was a

4    substantial risk of serious harm to Plaintiff's vision or that his actions caused the injury.

5    <u>Farmer</u>, 511 U.S. at 837; <u>Conn</u>, 591 F.3d at 1098.

6         Based on the foregoing, Defendants have shown there is no genuine issue of

7    material fact as to whether Defendant Ajimine knowingly disregarded a substantial risk of

8    serious harm to Plaintiff and thereby violated his Eighth Amendment rights. <u>See</u> <u>Celotex</u>

9    <u>Corp.</u>, 477 U.S. at 323. In response, Plaintiff has failed to designate specific facts showing

10   that there is a genuine issue for trial or identify with reasonable particularity the evidence

11   that precludes summary judgment. <u>Id.</u> at 324; <u>Keenan</u>, 91 F.3d at 1279. Accordingly,

12   Defendants are entitled to summary judgment on the Eighth Amendment claim against

13   Defendant Ajimine.

14        **D.    <u>Defendant Hassman</u>**

15        Defendants assert Defendant Hassman correctly administered the autorefraction test

16   and Plaintiff's loss of right eye vision was a result of his detached right retina, not the use

17   of an x-ray. Dkt. No. 15 at 22. Defendants assert that Defendant Hassman did not use an

18   x-ray but an autorefractor which measures how well an individual's eye processes light to

19   determine their refractive error. <u>Id.</u> The autorefractor projects an image into the eye,

20   passing through the part of the inner eye, off the retina and back to the machine's sensor; it

21   does not fire x-rays into the inmate's eyes and does not cause blindness. <u>Id.</u> It helps

22   optometrists image the inner eye and determine the prescription needed if eyeglasses are

23   prescribed. <u>Id.</u> Defendants also assert that the use of eye drops to dilate the eye's pupil to

24   help the machine take accurate measurements also do not cause blindness. <u>Id.</u> Defendants

25   assert that Defendant Hassman made multiple attempts to capture results from Plaintiff's

26   right eye but was unable to do so; therefore, Plaintiff was referred to optometry for further

27   evaluation. <u>Id.</u> Defendants contend that the autorefraction had no bearing on Plaintiff's

28   loss of vision in his right eye, and therefore he has no basis to argue that Defendant

United States District Court
Northern District of California

25

1    Hassman was deliberately indifferent to his medical needs.  Id.

2          Plaintiff asserts in opposition that Defendant Hassman "weaponized" the

3    autorefraction machine to destroy his right eye vision.  Dkt. No. 19 at 38.  He asserts

4    Defendant Hassman position the device close to Plaintiff's eye and took at least 12 "shots"

5    while walking back and forth from the room to "click" the machine.  Id. at 38-39.  Plaintiff

6    claims that he felt "invisible radiated heat flashes burning into his eyeball each time she

7    took the shot." Id. at 39.  He asserts Defendant Hassman blatantly lied in denying that she

8    weaponized the vision.  Id. at 40.

9          In reply, Defendants assert that Plaintiff's claims regarding the manipulation of the

10   autorefraction test are merely speculative and unsupported by any qualified medical

11   opinion or documentation.  Dkt. No. 20 at 4.  Defendants assert that Plaintiff cannot show

12   that the autorefraction had any bearing on his loss of vision in his right eye, but that

13   instead, the test led to more medical treatment for Plaintiff that eventually led to a

14   diagnosis.  Id.

15         Having carefully reviewed the evidence and construing the evidence in the light

16   most favorable to Plaintiff when appropriate, the Court finds that there is no genuine

17   dispute as to any material fact relating to Plaintiff's claim that Defendant Hassman acted

18   with deliberate indifference to his serious medical needs.  It is undisputed that Defendant

19   Hassman performed the autorefraction test as scheduled by Defendant Ajimine on the

20   same day of the referral.  Defendants have submitted undisputed evidence explaining how

21   the autorefractor works and its purpose.  See supra at 10.  Other than his own speculation,

22   Plaintiff submits no probative evidence to support his claim that Defendant Hassman

23   "weaponized" the autorefractor to shoot "invisible radiated heat flashes" into his right eye

24   in order to destroy his vision.  Rather, Plaintiff's medical records include the examination

25   of two ophthalmologists who concurred that Plaintiff's vision loss was due to a retinal

26   detachment caused by trauma; their examinations did not involve any conclusion that

27   Plaintiff's right eye was damaged by anything like harmful rays being shot into the eye.

28   See supra at 12.  In response, Plaintiff has failed to come forth with any probative evidence

in support his claim against Defendant Hassman from which a jury could reasonably render a verdict in his favor.  In re Oracle Corporation Securities Litigation, 627 F.3d at 387.

Based on the foregoing, Defendants have shown there is no genuine issue of material fact as to whether Defendant Hassman acted with deliberate indifference in administering an autorefraction test, thereby violating Plaintiff's Eighth Amendment rights.  See Celotex Corp., 477 U.S. at 323.  In response, Plaintiff has failed to designate specific facts showing that there is a genuine issue for trial or identify with reasonable particularity the evidence that precludes summary judgment.  Id. at 324; Keenan, 91 F.3d at 1279.  Accordingly, Defendants are entitled to summary judgment on the Eighth Amendment claim against Defendant Hassman.

### E.    Leave to Amend New Claims

In opposition, Plaintiff makes new allegations against the optometrist, Dr. Ryan, and Dr. Buda, as his PCP, in what appears to be an attempt to state an Eighth Amendment claim against them.  The Court notes that Plaintiff did not explicitly request leave to amend, nor did he do so at any time prior, to add Dr. Ryan and Dr. Buda as defendants to this action.  Nevertheless, the Court will consider whether an amendment is appropriate.

Federal Rule of Civil Procedure 15(a) is to be applied liberally in favor of amendments and, in general, leave shall be freely given when justice so requires.  See Janicki Logging Co. v. Mateer, 42 F.3d 561, 566 (9th Cir. 1994); cf. id. (attempt to amend complaint requiring amendment of scheduling order under Fed. R. Civ. P. 16 must be based upon good cause).  ""'"In the absence of any apparent or declared reason–such as undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.– the leave sought should, as the rules require, be "freely given."'"  Hall v. City of Los Angeles, 697 F.3d 1059, 1073 (9th Cir. 2012) (citations omitted).

Leave need not be granted where the amendment of the complaint would cause the opposing party undue prejudice, is sought in bad faith, constitutes an exercise in futility, or

1   creates undue delay.  See Janicki Logging Co., 42 F.3d at 566; Roberts v. Arizona Bd. of

2   Regents, 661 F.2d 796, 798 (9th Cir. 1981).

3       Here, the Court finds granting leave to amend to add claims against Dr. Ryan and

4   Dr. Buda would constitute an exercise in futility because the allegations, even if true, fail

5   to state a claim for relief.  Plaintiff alleges that Dr. Ryan was in the room while Defendant

6   Hassman was administering the autorefraction test.  However, the Court has found that

7   Plaintiff has failed to set forth any evidence to support his claim that Defendant Hassman

8   acted with deliberate indifference to his serious medical needs at that time.  Accordingly,

9   Plaintiff's allegations fail to establish that Dr. Ryan was aware of a substantial risk of

10  serious harm to Plaintiff at that time and yet failed to take reasonable steps to abate it.

11  Furthermore, Dr. Ryan subsequently provided treatment to Plaintiff based on his referral

12  on June 12, 2019.  Lastly, there are no allegations that indicate that any deficiency in Dr.

13  Ryan's cataract diagnosis at that appointment amounts to anything more than perhaps

14  negligence or malpractice.  See Toguchi, 391 F.3d at 1060; Hallett, 296 F.3d at 744 (9th

15  Cir. 2002); Franklin, 662 F.2d at 1344.  Lastly, there are no grounds for a deliberate

16  indifference claim based on Dr. Ryan's appropriate referral of Plaintiff to an

17  ophthalmologist for further treatment.

18      With regard to Dr. Buda, the only direct interaction he had with Plaintiff during the

19  relevant time period was on August 16, 2019, when they spoke regarding Plaintiff's refusal

20  to proceed with surgery to repair the detached retina.  See supra at 13.  Plaintiff's only

21  claim against Dr. Buda is that he required Plaintiff to pay for a "second" opinion.

22  However, such an opinion would have been a third opinion, since Plaintiff had already

23  been evaluated by Dr. Gibb and then Dr. Rodden, and the two concurred that Plaintiff

24  needed surgery to correct his retinal attachment.  Id. at 14.  Furthermore, Dr. Buda had

25  already approved and scheduled Plaintiff's surgery to repair a retinal detachment as

26  recommended by the two ophthalmologists; such actions do not indicate deliberate

27  indifference to Plaintiff's serious medical needs by Dr. Buda.  Dr. Buda also took

28  reasonable steps to urge Plaintiff to go ahead with the surgery knowing that there was a

United States District Court
Northern District of California

28

substantial risk of serious harm, i.e., permanent blindness, if there was further delay. However, Plaintiff was the one who refused to move forward without obtaining another costly third opinion for which he did not want to pay. Accordingly, the delay was caused by Plaintiff's refusal to proceed with treatment rather than a denial of treatment by Dr. Buda. Lastly, the difference of opinion between Dr. Buda and Plaintiff regarding the need for a third opinion does not give rise to a § 1983 claim. Franklin, 662 F.2d at 1344.

Plaintiff alleges for the first time that he submitted several healthcare requests in January 2020 requesting retinal detachment surgery, before he was transferred to CSP-SAC on January 24, 2020. See supra at 14-15. However, there are no allegations that any of the Defendants in this action were responsible for any lack of response to those requests, and Dr. Buda ceased being Plaintiff's PCP after October 2019. Id. at 3. Accordingly, these new allegations are insufficient to support additional deliberate indifference claims against Defendants.

Based on the foregoing, Plaintiff is not granted leave to amend to attempt to state new claims against Dr. Ryan and Dr. Buda.

## CONCLUSION

For the reasons stated above, Defendants C. Van Horn, A. Gibbs, E. Ajimine, and E. Hassman's motion for summary judgment is **GRANTED**.[7] Dkt. No. 15. Plaintiff's Eighth Amendment claims against these Defendants are **DISMISSED** with prejudice.

This order terminates Docket No. 15.

**IT IS SO ORDERED.**

Dated:  August 5, 2025

EDWARD J. DAVILA
United States District Judge

---

[7] Because the Court finds no constitutional violation occurred, it is not necessary to reach Defendants' qualified immunity argument.